UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | |
|---|---|
| DAVIS H. ELLIOT CONSTRUCTION COMPANY, INC., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>HIGH VOLTAGE MAINTENANCE CORPORATION, )<br>)<br>Defendant. | No. 5:21-CV-235-REW-MAS<br><br>OPINION & ORDER RE: § 14 |

\*\*\* \*\*\* \*\*\* \*\*\*

The parties (Davis H. Elliot Construction Co., Inc. (DHE) and High Voltage Maintenance Corp. (HVM)) conditionally resolved this case pending an order deciding a settlement-triggering issue. The issue is application *vel non* of § 14, a section of the governing subcontract labelled LIABILITY/LIMITATION OF LIABILITY AND REMEDY. Per the Court's Order, *see* DE 111, each side filed a concise brief targeting the lingering question, and the Court has carefully sifted the arguments against controlling Kentucky law.[1] In this contract-centric case, between sophisticated entities that bargained at arm's length and now litigate a purely economic loss, § 14 applies to limit HVM's liability.

The Court read and considered each of the cited cases and more broadly Kentucky law as pertinent. DHE leans on *Guangzhou Consortium Display Prod. Co., Ltd. v. PNC Bank, Nat'l Ass'n*, 956 F. Supp. 2d 769 (E.D. Ky. 2013) and *Edwards v. Hambel*, No. 2003-CA-940-MR, 2005 WL 3116096 (Ky. Ct. App. Nov. 23, 2005). HVM chiefly references *Cumberland Valley Contractors, Inc. v. Bell Cnty. Coal Corp.*, 238 S.W.3d 644 (Ky. 2007). The parties highlighted

---

[1] And the Court had the benefit of prior briefing in the pretrial context. As the Court previously determined, Kentucky law governs.

1

nuances and application details in a scenario not exactly like any of the cases. Importantly, *Edwards* is an unpublished decision from the Kentucky Court of Appeals, while *Cumberland Valley* is a published decision from the Kentucky Supreme Court. In the end, HVM clearly has the better of it here. Principles of Kentucky law readily warrant application of § 14 in this case.[2]

It is true that *Edwards* arose in a Kentucky Building Code scenario, and it has broad prohibitory language (perhaps especially broad, given the elided treatment). The *Edwards* Court held that individual home buyers did not, indeed could not, waive a statutory building code claim by virtue of an "as is" clause included in the governing sales contract. Noting the public protection and uniformity values behind the Building Code, the Court stressed the applicability of the "provisions . . . designed to protect the individual home buyer." *See Edwards*, 2005 WL 3116096, at *2. The evident blanket holding was that "any benefits or rights conferred under the Uniform State Building Code cannot be waived privately by an *individual*." *Id.* at *3. (emphasis added).

Given *Cumberland Valley*, though, there is much reason to doubt that *Edwards* extends beyond its peculiar facts.[3] In *Cumberland Valley*, the Supreme Court essentially reconfirmed the primacy of freedom of contract in the Commonwealth. *See* 238 S.W.3d at 650. There, the parties (coal lessee and mine operator/contractor) entered a mining contract. The lessee had a primary

---

[2] The Court finds *Guangzhou* inapplicable here. In *Guangzhou*, a bank tried to rely on a generic waiver of "all defenses" to enforce a guaranty that lacked statutory enforceability requisites under Kentucky law. The statutory requirements in KRS 371.065 made the guaranty at issue "void *ab initio*." *See Guangzhou*, 956 F. Supp. 2d at 793. Thus, the waiver, far from giving up extant guarantor rights or remedies, was instead being used offensively to animate a null instrument and impose guarantor duties that could not arise or exist under the Kentucky statute. Judge Bunning rejected the argument on the text of KRS 371.065 (thus, "the plain meaning of the statute") and cases applying that statute. On the analysis of waiver clarity, likely dicta, the decision applied recognized waiver standards, *see id.* (enumerating factors, including party experience, consideration, access to counsel, and the totality), and then suggested a need to list the statute affected. On review, that principle does not appear at the cited point of origin. Whatever the requirement for giving up the foundational strictures of a guaranty, suffice it to say that Kentucky did not go so far in *Cumberland Valley*, which is the Kentucky Supreme Court's word on the specificity requirement for an exculpatory contract clause.

[3] Justice Minton appeared on both decisions, authoring the published case.

contractual and a statutory duty to accurately map the mine and future works. A flooding event in the mine, tied to bad mapping, destroyed the operator's equipment, leading to a claim. However, the contract had expressly required operator inspection and also prevented any recovery against lessee for flood damage. The question was whether this clause would apply to protect lessee, given its statutory safety duty to mine the map accurately. After all, the *Cumberland Valley* Court began the opinion: "As a general rule, a party cannot contract away liability for damages caused by that party's failure to comply with a duty imposed by a safety statute." *Id.* at 646. Despite that point of origin, the case enforced the limiting clause.

Why? *Cumberland Valley* plainly framed the enforcement of an exculpatory contractual clause as turning on the dynamics of contract formation, the nature of loss, and the sophistication of the contracting parties. There, despite presence of a statutory safety or public purpose, those values led to contract enforcement. The same obtains here.

Thus, in *Cumberland Valley*, the Court harkened back to century old "basic principles" on assessing an exculpatory clause. "In deciding to uphold the exculpatory clause at issue there, our predecessors noted that the parties were 'dealing at arm's length and upon an equal footing[,]' and that the contract was entered into voluntarily without either party being compelled to enter into the contract on the basis of necessity." *Id.* at 650 (alteration in original) (quoting *Greenwich Ins. Co. v. Louisville & Nashville R.R. Co.*, 66 S.W. 411, 412–13 (Ky. 1902)). Because the instant contract was formed "on an entirely voluntary basis" and between parties "with equal bargaining power" the *Cumberland Valley* Court saw "no reason to invalidate the exculpatory clause[.]" *Id.*

Additionally, the Court noted unevenness in treatment of exculpatory clauses relative to statutory duties. *Cumberland Valley* eschewed any categorical approach. Instead, harmony with "recent cases, even those invalidating exculpatory clauses on the basis of public policy," would

3

come by "focusing on the parties' bargaining power." *See id.* Thus, per *Cumberland Valley*, a voluntary agreement struck between parties on "a footing of equality" should be honored, especially absent statutory specification of "a more definite standard." *See id.* at 654 (citing, *e.g.*, employee workplace protections). Even, then, in the context of a compromised *statutory* duty, equivalent bargaining parties may alter or negotiate concerning the scope of liability. Absent indicia of inequality, in this context, Kentucky enforces what the parties negotiate. *Cf. Martin Cnty. Coal Corp. v. Universal Underwriters Ins. Co.*, 727 F.3d 589, 597 (6th Cir. 2013) (noting *Cumberland Valley*'s invalidation requirement of "major disparity in bargaining power" and voiding indemnification agreement, in personal injury context, "bargained by parties in clearly unequal positions"); *Ronald A. Chisholm Ltd. v. Am. Cold Storage, Inc.*, No. 3:10-cv-57-CRS, 2012 WL 1110468, at *4 (W.D. Ky. Mar. 30, 2012) (upholding limitation of liability clause, despite "potential safety statute violations" because, per *Cumberland Valley*, "both parties are of equal bargaining power and validly agreed to limit Defendants' liability").

The nature of harm also certainly mattered to the *Cumberland Valley* court. The Court noted, "[a]s appellees point out, there is no published Kentucky state case in which an exculpatory clause was invalidated when only property loss (as opposed to personal injury) occurred." *Cumberland Valley*, 238 S.W.3d at 653. Even then, though, *Cumberland Valley* did not draw a categorical line that hinged only on injury type. Rather, the Court summarized, "[w]hen our courts have invalidated exculpatory clauses based upon a breach of a statutory duty or breach of a duty to the public at large, those agreements involved a major disparity in bargaining power between the parties." *Id.*

Finally, it is notable that *Cumberland Valley* involved a scenario in which both sides of the contract had a hand in fulfilling the relevant statutory duty. *Cumberland Valley* determined that

4

both the lessee and the operator/contractor, from the perspective of the safety statute (KRS 352.450), had mapping obligations. *See id.* at 652. The contract assigned the duty to the lessee, but the statutory obligation impressed both. Thus, the contract allocated risk from the shared duty and, in the commercial context, earned enforcement with no corresponding public harm.[4] "We cannot see how the public is harmed by these two sophisticated parties to the contract (who share the duty of preparing accurate mine projections) allocating the risk of their own losses for any inaccuracies between themselves." *Id.*

*Cumberland Valley* conclusively supports enforcement of § 14 in this case. There may be some dispute over precise term origin, but the contract was one entered between sophisticated commercial firms engaged in a voluntary and arm's length negotiation. As HVM notes, the contract is on DHE letterhead, and DHE conceded in quoted discovery that it was the "author and scrivener" of the contract. HVM may have sought the liability cap, but the term is bilateral, protecting each side from exposure beyond the cap and from excluded damage categories.

Further, the contract is between entities, and § 14 does not here apply to limit the recovery of any *individual*. The case does not feature personal injury damages. Indeed, the losses at issue are economic, classic breach of contract harms subject to negotiation "to shift the risk of loss," *Cumberland Valley*, 238 S.W.3d at 651, as allocated between the commercial parties.

The Court also agrees with HVM that, viewed through the *Cumberland Valley* prism, the duties have a shared or at least overlapping character. What HVM promised to DHE, DHE likewise promised to KU. *See* Plaintiff Ex. 06 (Prime Contract) (*e.g.*, at § 1.2.1 (requiring review for compliance with all local, state, and federal requirements); § 3.0 (requiring all work to meet

---

[4] The Court readily noted that the case involved no third-party injury or loss. Obviously, a decision on the scope of the contracting parties' risk allocation, as between them, would not "affect the ability of a third-party to bring an action against anyone who enters into a contract which contains an exculpatory clause." *Id.* at 650 n.18.

contract specs); § 6.2 (making prime contractor responsible for "performance of work by subcontractor")). The prime contract specifications, Plaintiff Ex. 04, at, *e.g.*, § 7.5, barred deviation from manufacturer installation instructions except with consent of the maker, notice to KU, and documentation of the deviation. Surely, within the umbrella of the KU contract and from the perspective of KBC application, the code-compliance duties were overlapping. That's certainly how DHE postured the case in summary judgment briefing: "The General Conditions of the Subcontract identify the 'Contract Documents' as <u>inclusive</u> of the documents comprising the Prime Contract between DHE and the Owner. . . . In turn, the Prime Contract lists the Project Specifications, *including any applicable installation guidelines*, as part of the contractual agreement such that the contractor—and its subcontractor(s)—must abide by them." DE 65 at 19 (DHE Reply) (second emphasis added). The installation guidelines duties, in particular following manufacturer instructions, were the part of the Code (and thus the contract) as breached by HVM in this case. The Court cannot ignore that DHE owed a concomitant duty of compliance to KU.

The Court finds § 14 enforceable and applicable to the claims asserted, contractual "or otherwise." The parties had equivalent bargaining power in a voluntary transaction. The loss here impacted is economic and addressed an area of contract (and statutory) compliance in which both parties had a duty and obligation. Under the clear principles of *Cumberland Valley*, § 14 would govern the damage components and exposure in this case.

A few additional points and notes. The Court is unconvinced by DHE's argument about knowing and intentional waiver. *Cumberland Valley* suggests the test is whether a waiver is "so 'clear and understandable that an ordinarily prudent and knowledgeable party to it will know what he or she is contracting away; it must be unmistakable.'" *Cumberland Valley*, 238 S.W.3d at 649 (quoting *Hargis v. Baize*, 168 S.W.3d 36, 47 (Ky. 2005)). In *Cumberland Valley*, the clause did

not reference the safety statute, and yet the Court affirmed enforceability, finding the hazard involved "clearly within the contemplation of the provision." *Id.* at 650 (quoting *Hargis*, 168 S.W.3d at 47).

In the Court's view, it is disingenuous for DHE to claim "[t]here is no evidence . . . that . . . DHE was aware of the rights and remedies under the Kentucky Building Code." DE 114 at 6–7. DHE's sole claim for breach of contract hinged on application of that Code via the contract's terms. As the Court found, the contract (§ 12) required HVM to comply with all laws and codes, including the Kentucky Building Code. That finding reflected incorporation of the Code's performance metrics (including the NEC duty to follow manufacturer installation instructions on the splice(s)) into the contract and initiated the breach finding. *See* DE 81 at 9, 13 (noting incorporation of NEC standards and performance measures). If the contract incorporated the Code in § 12, then it is fair to view the contract's remedial specifications, a mere two sections hence, in § 14, as entered with awareness of the Code's provisions. In for a penny, in for a pound.

Is the waiver here unmistakable? It does not cite any statute, but the section does triply communicate the scope of the remedial limit, in all caps and bold font, no less. Per § 14, "**IN NO EVENT, REGARDLESS OF THE FORM OF THE CLAIM OR CAUSE OF ACTION (WHETHER BASED IN CONTRACT, INFRINGEMENT, NEGLIGENCE, STRICT LIABILITY, OTHER TORT OR OTHERWISE), SHALL A PARTY'S LIABILITY TO THE OTHER PARTY** . . . **EXCEED AN AGGREGATE OF FIVE HUNDRED THOUSAND DOLLARS ($500,000).**" Any reasonable entrant would know that this is a universal and total ceiling applicable to *all* claim varieties. In "no event" can liability exceed the aggregate cap. That applies "regardless of the form of the claim or cause of action." The parenthetical reinforces the negotiated breadth by covering listed bases for claims and then concluding with the open-ended

phrase "or otherwise."  Any reasonable party entering this term would realize that the liability cap, however and by whatever theory pursued, would be $500,000.  That is unmistakable, under the principles of *Cumberland Valley* and Kentucky law.

Further, in validating § 14, the Court comments on what that section really does.  As pertinent, the clause does not forgo rights or any cause of action under KRS Chapter 198B, or any other statute for that matter.  Rather, it places a negotiated boundary on total exposure for the specific subject matter of the contract at issue.  And incidentally, given that the cap is bilateral and sets the bounds at over triple the contract's value ($152,280.00), *see* DE 17-1 at 4, the provision hardly suggests an unfairly cramped or nominal damage fence.[5]

Accordingly, the Court **FINDS** that the liability cap (§ 14) applies.

This the 31st day of March, 2025.

Signed By:
*Robert E. Wier*
United States District Judge

---

[5] One wonders how the remedy under the Building Code would figure, in the context of this case.  Although DHE stresses unrealized potential safety implications of the faulty splice(s), the only damages in the case are from splice replacement.  The Building Code remedy (a standalone under KRS 198B.130), as to an economic loss, typically is replacement or diminution in value.  Thus, "[r]easonably interpreted, if a statutory violation has occurred, KRS 198B.130 requires payment of either the cost of repair to bring the property up to code compliance or payment of the diminution in fair market value of the property because of code infractions, whichever is less." *Real Est. Mktg., Inc. v. Franz*, 885 S.W.2d 921, 927 (Ky. 1994), *overruled on other grounds by Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729 (Ky. 2011). This makes the cap here especially plausible given the value of the contract itself.  Though DHE would have endeavored to seek related losses (such as testing and diagnosis), the Court wonders whether and how those would have fit given *Franz* and the balance of § 14, which bilaterally excluded incidental and consequential damages.